IN THE SUPREME COURT OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| CITY OF SARASOTA FIREFIGHTERS' PENSION FUND, STEAMFITTERS LOCAL 449 PENSION FUND, and STEAMFITTERS LOCAL 449 RETIREMENT SECURITY FUND, | § § § § § § | No. 305, 2023 |
| | § § | Court Below: Court of Chancery of the State of Delaware |
| Plaintiffs Below, Appellants, | § § | |
| v. | § § | C.A. No. 2022-0698 |
| INOVALON HOLDINGS, INC., KEITH R. DUNLEAVY, MERITAS GROUP, INC., MERITAS HOLDINGS, LLC, DUNLEAVY FOUNDATION, ANDRÉ HOFFMANN, CAPE CAPITAL SCSp, SICAR-INOVALON SUB-FUND, ISAAC S. KOHANE, MARK A. PULIDO, DENISE K. FLETCHER, WILLIAM D. GREEN, WILLIAM J. TEUBER, and LEE D. ROBERTS, | § § § § § § § § § § § § § § | |
| Defendants Below, Appellees. | § | |

Submitted: February 21, 2024
Decided: May 1, 2024

Before **SEITZ**, Chief Justice; **VALIHURA**, **TRAYNOR**, **LEGROW**, and **GRIFFITHS**, Justices, constituting the Court *en Banc*.

Upon appeal from the Court of Chancery. **REVERSED** and **REMANDED**.

Ned Weinberger, Esquire (*argued*), Brendan W. Sullivan, Esquire, Labaton Sucharow LLP, Wilmington, Delaware. *Of Counsel*: John Vielandi, Esquire, Labaton Sucharow LLP, New York, New York. Jeremy Friedman, Esquire, David Tejtel, Esquire, Friedman Oster & Tejtel PLLC, Bedford Hills, New York. Lee D. Rudy, Esquire, Eric L. Zagar, Esquire, J. Daniel Albert, Esquire, Geoffrey C. Jarvis, Esquire, Grant D. Goodhart, III, Esquire, Kessler Topaz Meltzer & Check, LLP, Radnor, Pennsylvania *for Appellants*.

Raymond J. DiCamillo, Esquire, Kevin M. Gallagher, Esquire (*argued*), Craig K. Ferrere, Esquire, Richards, Layton & Finger, P.A., Wilmington, Delaware *for Appellees Inovalon Holdings, Inc., Isaac S. Kohane, Denise K. Fletcher and Lee D. Roberts*.

William M. Lafferty, Esquire, Ryan D. Stottmann, Esquire, Alexandra M. Cumings, Esquire, Morris Nichols Arsht & Tunnell LLP, Wilmington, Delaware. *Of Counsel*: Blair Connelly, Esquire (*argued*), Latham & Watkins LLP, New York, New York. Kristin N. Murphy, Esquire, Ryan A. Walsh, Esquire, Latham & Watkins LLP, Costa Mesa, California *for Appellees Mark A. Pulido, William D. Green, and William J. Teuber*.

**VALIHURA,** Justice:

*INTRODUCTION*

This is an appeal of the Court of Chancery's bench ruling granting Defendants Below-Appellees' motions to dismiss in full. Plaintiffs Below-Appellants filed suit in the Court of Chancery challenging an acquisition of Inovalon Holdings, Inc. ("Inovalon" or the "Company") by a private equity consortium led by Nordic Capital, a Swedish private equity firm (the "Transaction").[1] Plaintiffs asserted several breach of fiduciary duty claims, an unjust enrichment claim, and a claim alleging a breach of the Company's charter. Defendants argued that the claims must be dismissed because the Transaction satisfied the elements of *Khan v. M & F Worldwide Corp.* ("*MFW*"),[2] thereby subjecting the board's actions to business judgment review.

On appeal, Appellants challenge the Court of Chancery's dismissal under the *MFW* framework because: (i) the Company failed to condition the Transaction *ab initio* on the approval of the special committee; and (ii) the vote of the minority stockholders was not informed because the proxy disclosure (the "Proxy") omitted material information. Because we conclude that the Court of Chancery erred in holding that the vote of the minority stockholders was adequately informed, we REVERSE the decision of the Court of Chancery.

---

[1] We refer to Nordic Capital, together with its affiliates, as "Nordic."

[2] 88 A.3d 635 (Del. 2014), *overruled on other grounds by Flood v. Synutra Int'l, Inc.*, 195 A.3d 754 (Del. 2018).

## I. RELEVANT FACTUAL AND PROCEDURAL BACKGROUND[3]

### A. *The Parties*[4]

Plaintiffs Below-Appellants are City of Sarasota Firefighters' Pension Fund, Steamfitters Local 449 Pension Fund, and Steamfitters Local 449 Retirement Security Fund (collectively, "Appellants").[5] Appellants were holders of Inovalon Class A Common Stock at all times relevant to the Action.[6]

Defendant Below-Appellee Inovalon is a provider of cloud-based platforms related to the healthcare industry with diverse capabilities for use in connection with healthcare plans and providers, as well as life-sciences companies and pharmacy organizations.[7] Defendant Below-Appellee Dr. Keith Dunleavy founded Inovalon in 1998, served as the Company's CEO through the 2021 Transaction, and currently serves as Inovalon's CEO following the Transaction.[8] Dunleavy held a substantial amount of Inovalon stock both personally and through his controlled companies, which are also named defendants in the Complaint: Meritas Group, Inc. ("Meritas Group"); Meritas Holdings, LLC ("Meritas

---

[3] The facts, except as otherwise noted, are taken from the Verified Class Action Complaint filed on August 9, 2022 [hereinafter "Complaint" or "Compl."] and the Court of Chancery's telephonic bench ruling on July 31, 2023 [hereinafter "Bench Ruling"]. *See* Opening Br., Ex. A. In this procedural posture, they are presumed to be true.

[4] When addressing the proceedings below, we refer to Appellants as "Plaintiffs" and Appellees as "Defendants."

[5] A33 (Compl. ¶ 10).

[6] *Id.*

[7] A33 (Compl. ¶ 11). Inovalon is incorporated in Delaware and headquartered in Bowie, Maryland.

[8] A33 (Compl. ¶ 12). Dunleavy also served as the Chair of Inovalon's board of directors from the board's creation in 2006 through the Transaction. *Id.*

4

LLC"); and the Dunleavy Foundation (collectively, the "Dunleavy Defendants").[9]

Defendant André Hoffmann served on Inovalon's board from 2008 until July 2020 and owned a significant amount of Inovalon stock — amounting to 22.8% of Inovalon's outstanding voting power. He held the stock both personally and through his controlled company, Cape Capital SCSp, SICAR-Inovalon Sub-Fund ("Cape Capital") (collectively, the "Hoffmann Defendants").[10]

The Complaint also named as defendants Inovalon's board that issued the Proxy — Dunleavy, Isaac S. Kohane, Mark A. Pulido, Denise K. Fletcher, William D. Green, William J. Teuber, and Lee D. Roberts (collectively, the "Director Defendants").[11] Pulido, Green, and Teuber served on the special committee (the "Special Committee").[12]

## B. Background of Inovalon

### 1. Capitalization

Inovalon launched its IPO in 2015 at $27 per share. After the IPO, Inovalon had

---

[9] Meritas Group is a Delaware corporation. Dunleavy is its sole officer and director. It owned 42,356,820 shares of Inovalon Class B stock at the time of the Transaction, and it rolled over 17,073,171 of those shares in the Transaction. Meritas LLC is a Delaware LLC that owned 7,470,435 shares of Inovalon Class B stock at the time of the Transaction. Dunleavy is the sole non-member manager of the LLC. The Dunleavy Foundation is a Delaware non-profit organization that owned 5,120,000 Inovalon Class B shares at the time of the Transaction. A33–A35 (Compl. ¶¶ 13–16).

[10] A35–A36 (Compl. ¶¶ 17–18). Cape Capital is a Luxembourg Company controlled by Hoffmann. It rolled over 14,634,147 Class B shares in the Transaction. A36 (Compl. ¶ 19).

[11] A36–A40 (Compl. ¶¶ 20–26); *see also* A227–A481 (Cumings Aff., Ex. 1) (Schedule 14A Proxy Statement of Inovalon) (Oct. 15, 2021) [hereinafter "Proxy"].

[12] A40 (Compl. ¶ 30). The Complaint also highlighted the longstanding professional and personal relationships that certain board members had with Dunleavy and Hoffmann and some of the board members' compensation from Inovalon. A36–A40 (Compl. ¶¶ 20–26).

two classes of common stock: publicly traded Class A common stock that entitled its holders to one vote per share; and non-publicly traded, super-voting Class B common stock that entitled its holders to ten votes per share. Inovalon's charter required that if there were ever a change of control transaction, its Class A and Class B stockholders must be treated equally — absent the differential treatment being approved by a separate vote of each class.[13]

At the time of the Transaction, Dunleavy held 70.4% of Inovalon's Class B stock and less than 1% of its Class A stock both directly and indirectly through his controlled entities. Despite owning less than 50% of Inovalon's total outstanding shares, Dunleavy controlled 64.1% of Inovalon's total voting power. Hoffmann held the second largest block of Inovalon's Class B shares both personally and through Cape Capital. Hoffmann controlled roughly 23% of Inovalon's total voting power at the time of the Transaction.[14] Together, Dunleavy and Hoffmann controlled approximately 86% of Inovalon's stockholder voting power at the time of the Transaction.

### 2. *Inovalon's Recent Successes*

In recent years, Inovalon experienced substantial success.[15] The Company reported annual revenue of over $642 million in 2019 and $667.5 million in 2020. Other metrics

---

[13] A41 (Compl. ¶ 33) (quoting Article IV Section D(2)(c) of Inovalon's Second Amended and Restated Certificate of Incorporation).

[14] A42 (Compl. ¶ 36). Hoffmann retired from his position on the board in July 2020, but maintained his Class B ownership.

[15] A45 (Compl. ¶ 41) (detailing that Inovalon generates a substantial majority of its revenue through the sales or subscription licensing of its platform solutions, as well as from related arrangements for advisory, implementation, and support services).

6

demonstrated the Company's strong financial health: year-over-year adjusted EBITDA increased 23% in Q1 of 2021; cash flows from operations grew by 22% in 2020; and, as Dunleavy noted, the Company was seeing "robust, expanding sales pipelines despite successive quarters of very strong deal closures."[16]

Much of Inovalon's growth was fueled by several key acquisitions and partnerships. Inovalon acquired Avalere Health, Inc. in 2015; Creehan Holding Co., Inc. in 2016; and Ability in 2018. Additionally, Inovalon had recently executed partnerships with the United States government, Walmart Inc., AstraZeneca plc, Humana Inc., and Cardinal Health, Inc., among others.[17] Following these developments, Inovalon reported a 17% increase in revenue for the second quarter of 2021 over the second quarter of 2020 and, according to the Complaint, "multiple market analysts assigned a target price for the Company of $45 per share."[18]

## C. Inovalon Explores its Strategic Options

Inovalon's continued success did not go unnoticed. In late 2020, Thoma Bravo, LP, an American private equity firm, expressed an interest in acquiring Inovalon. Dunleavy, in response, met via teleconference with Thoma Bravo without any other board members on December 2, 2020. Two days later, he informed Teuber that he had met with Thoma Bravo and that he would handle future negotiations with the firm. On February 1, 2021,

---

[16] A45–A46 (Compl. ¶¶ 42–43) (internal quotation marks and citation omitted).

[17] A48 (Compl. ¶ 47). During the Covid-19 pandemic, Inovalon was able to partner with Medicare and Medicaid Services to distribute software that helped Covid-19 vaccine administration across the country.

[18] A50 (Compl. ¶ 51).

Dunleavy met with a large technology company and, according to the Proxy, discussed "future opportunities for strategic partnerships, commercial arrangements or other transactions between [the technology company] and [Inovalon]."[19] At an Inovalon board meeting on February 11, 2021, Dunleavy "provided an overview of his engagement with [Thoma Bravo] and [the technology company] to date . . . ."[20] Following his presentation, the board authorized Dunleavy to "engage in discussions with financial advisors who could potentially assist the [board] with an exploration of various strategic alternatives, including methods for raising strategic capital."[21] In April 2021, Nordic Capital entered the scene.

### 1. *Nordic Expresses an Interest in Acquiring Inovalon*

On April 20, 2021, Nordic partner Daniel Berglund contacted an Inovalon representative concerning a potential acquisition of the Company. In response, Inovalon's board invited J.P. Morgan Securities LLC ("J.P. Morgan") to the May 3, 2021 board meeting to present on strategic alternatives. During the board meeting, the board authorized J.P. Morgan to explore a capital raise from a third-party and the exploration of potential strategic partnerships. It did not, according to Plaintiffs, authorize J.P. Morgan to explore an acquisition of the Company.[22] Dunleavy met virtually with Nordic representatives on May 26, 2021, while J.P. Morgan was conducting its initial outreach. At this meeting, Nordic shared that one of its investment funds might be interested in a

---

[19] A259 (Cumings Aff., Ex. 1) (Proxy at 22).
[20] *Id.*
[21] *Id.*
[22] A53 (Compl. ¶ 59).

potential acquisition of Inovalon.[23]  J.P. Morgan was formally retained by Inovalon's board on June 2.  The retention agreement authorized J.P. Morgan to explore a potential merger and made J.P. Morgan's payment contingent on Inovalon completing a transaction.[24]

A week later, at a board meeting on June 9, 2021, J.P. Morgan updated the board on its outreach efforts concerning, first, potential equity and debt offerings and, second, potential mergers.[25]  At the meeting, J.P. Morgan relayed that it had engaged with thirteen parties, held management discussions with seven potential acquirers, and received proposals from three parties.[26]  The board then approved J.P. Morgan's continued engagement with potential strategic partners and buyers.  On June 11, 2021, Inovalon retained the law firm Latham & Watkins LLP ("Latham") to serve as its legal advisor.[27]  On June 24, Nordic signed a non-disclosure agreement ("NDA") with Inovalon.  At this point, other parties who were interested in a possible merger were also in the mix:  one had submitted an indication of interest offering an acquisition price of $38 per share and at least three other parties had expressed an interest in pursuing an acquisition.

On July 5, 2021, Dunleavy met with representatives of Nordic to discuss a potential

---

[23] Specifically, Nordic's fund — Nordic Capital Epsilon SCA, SICAV-RAIF — a Luxembourg investment fund, would acquire Inovalon.  A30 (Compl. ¶ 2).

[24] A54–A55 (Compl. ¶ 62) (alleging that the retention agreement did not mention any form of capital or debt raise; instead, it only addressed an acquisition or merger).

[25] A55–A56 (Compl. ¶ 64).

[26] *Id.*  Nordic was not one of the parties that had met with Inovalon management or J.P. Morgan.  A56 (Compl. ¶ 65).

[27] A56–A57 (Compl. ¶ 67) (Latham had previously worked with Nordic on unrelated mergers and acquisitions).  *See id.* (listing Latham's prior representations of Nordic, including:  (i) Nordic's early 2021 acquisition of Advanz Pharma; (ii) Nordic's early 2021 merger with Bioclinica; and (iii) Nordic's portfolio company, Clario, in a late 2021 divestiture).

transaction. At this meeting, Nordic indicated that it would follow up with a written indication of interest.[28] During this meeting, Nordic informed Dunleavy that in similar transactions, Nordic typically has requested that members of management participate in equity rollovers of their investment.[29] On July 6, Dunleavy received a communication from Permira Advisors LLC ("Permira") expressing a desire to submit an indication of interest.[30]

On July 12, 2021, Nordic submitted a formal letter of interest to acquire Inovalon for $43 per share.[31] Nordic stated that it was confident it could fund 100% of the purchase price with a mix of debt and equity but, if an equity rollover involving management were necessary, a special committee would be required.[32] It added that if an equity rollover were part of a final transaction, the transaction must be approved by a "majority of [the Company's minority] shareholders[.]"[33] Lastly, Nordic emphasized its commitment to Inovalon's existing management in executing their business plan.[34]

---

[28] A58–A59 (Compl. ¶ 72).

[29] *Id.* *See also* Rollover Equity, Wall Street Prep (last updated Feb. 20, 2024), https://www.wallstreetprep.com/knowledge/rollover-equity/ ("Rollover equity refers to the exit proceeds reinvested by a seller into the equity of the newly formed entity post-acquisition. An equity rollover is therefore designed to align the economic incentives among participants in the post-transaction entity."). It is at this point, according to Plaintiffs, that "the specter of Dunleavy's overriding conflict of interest should have been clear to the Board, necessitating a special committee to ensure a fair process." A59 (Compl. ¶ 73).

[30] A59 (Compl. ¶ 74) (adding that Dunleavy immediately forwarded Permira's communication to J.P. Morgan and, on July 7, Permira signed an NDA).

[31] A59 (Compl. ¶ 75).

[32] *Id.*

[33] A547 (Cumings Aff., Ex. 6) (Nordic's Letter of Interest) (July 12, 2021).

[34] A60 (Compl. ¶ 76) (noting that Nordic's letter explicitly stated: "the current management team of Inovalon is critical for the future success of the Company" and that Nordic "would be committed

In response to Nordic's letter, the board convened the next day to consider Nordic's offer and compare it with a potential offer from Permira.[35] Permira had verbally indicated that it was prepared to submit a non-binding indication of interest with a target price per share in the low $40s, payable in cash. Permira, however, needed an additional six weeks to complete due diligence.

Given Permira's noncommittal stance, Inovalon's board authorized J.P. Morgan and management to move forward with Nordic. The board instructed J.P. Morgan to propose a price of at least $44 per share for 100% of Inovalon and a $3.5 billion equity commitment from Nordic in exchange for an exclusivity agreement through August 2, 2021 (something that Nordic requested in its letter).[36] On July 14, 2021, Dunleavy again met with Nordic and relayed the board's instructions. Later that day, Nordic submitted an indication of interest at $44 per share and again stated that it expected to obtain 100% financing for the deal, which included a $3.5 billion equity commitment from Nordic as well as other equity commitments of $2.55 billion from its co-investors (collectively, the "Equity Consortium") and debt financing of $1.75 billion.[37] Nordic reiterated its commitment to current management: "[f]or the avoidance of doubt, we do not foresee any changes to Inovalon's

_____

to supporting the management in executing on its business plan and strategy for the Company.") (internal quotation marks and citation omitted).

[35] A60 (Compl. ¶ 77). It appears that the trial court mistakenly stated that this meeting occurred on June 13 as opposed to July 13. Bench Ruling at 9.

[36] A60–A61 (Compl. ¶ 78).

[37] A61 (Compl. ¶ 80).

organization or employees following the completion of the Proposed Transaction."[38]

Permira dropped out of consideration that same day.[39]  On July 16, Latham (Inovalon's counsel) met with Kirkland & Ellis LLP (Nordic's counsel) and "discussed the fact that [Inovalon's] Board was meeting soon to consider and approve the establishment of a special committee and also that they would each expect the special committee would need to evaluate whether [Inovalon] should enter into any exclusivity arrangement with [Nordic]."[40]

The board's next meeting was July 18, 2021.  At the meeting, Dunleavy relayed that Nordic had "increasing confidence" that it could provide $3.5 billion in equity; the potential for co-investors; and that Nordic had expressed a preference that Dunleavy roll over a portion of his equity in connection with the proposed merger.[41]  In response to Nordic's preference for an equity rollover in a potential transaction, Latham reviewed with the board its fiduciary duties.[42]  That day, the board appointed a Special Committee consisting of:  Teuber, Green, and Pulido.  Teuber was appointed as chair two days later.

2.  *The Special Committee Oversees the Transaction*

The Special Committee first convened on July 20, 2021.  At that meeting, the

---

[38] A62 (Compl. ¶ 81) (internal quotation marks and citation omitted).

[39] A62 (Compl. ¶ 82) (noting that Permira dropped out because it was unable to conduct its due diligence in light of how quickly the Transaction was moving).

[40] A62–A63 (Compl. ¶ 83) (internal quotation marks and citation omitted).

[41] A63–A64 (Compl. ¶ 85).

[42] A64 (Compl. ¶ 86) (Latham proceeded to provide "an overview of the use and establishment of a special committee in the context of transactions in which a[n] existing controlling shareholder may form part of the consortium proposing to acquire 100% of the company.") (internal quotation marks and citation omitted).

12

Special Committee selected Latham as its legal advisor;[43] planned to retain another financial advisor in addition to J.P. Morgan; and concluded that it would be willing to entertain Nordic's exclusivity request if Nordic were willing to improve its offer.[44] The Special Committee refrained from making a final decision regarding exclusivity until it received more information concerning Nordic's financing proposal.

The following day, July 21, 2021, Nordic formally requested that Dunleavy roll over a portion of his equity into the post-Transaction entity. Dunleavy promptly informed the Special Committee of this request. On July 22, the Special Committee held its second meeting during which it learned that Latham "continued to communicate with the legal counsel of [Nordic] as well as other potential parties that may participate as co-investors with [Nordic]."[45]

On July 23, the Special Committee retained Evercore, Inc. ("Evercore") as its financial advisor. Evercore confirmed that it had no "material relationships" with Inovalon.[46] Evercore indicated that it would submit a written memorandum summarizing its material relationships with potential counterparties. Evercore had worked with Nordic in the past and Nordic had paid Evercore $9 million in advisory fees in the two years

---

[43] *See* A263 (Cumings Aff., Ex. 1) (Proxy at 26) (stating that "although [Latham] had been retained in June 2021 as counsel to the Company, [Latham] was not the Company's historic counsel and was independent of Company management and Dr. Dunleavy.").

[44] A65–A66 (Compl. ¶¶ 87–89).

[45] A67 (Compl. ¶ 92) (internal quotation marks and citation omitted). Plaintiffs alleged that, "[t]hus, by at least July 22, 2021, the Special Committee and/or Latham were likely aware of the identity of some (if not all) of Nordic's proposed co-investors who would later form the Consortium." *Id.*

[46] A68 (Compl. ¶ 93).

preceding August 18, 2021. Additionally, Evercore concurrently advised Nordic in a separate, unrelated transaction, which it later disclosed to the Special Committee. Evercore also had conflicts with members of the Equity Consortium: it had collected "tens of millions of dollars" in fees prior to the Transaction from members of the Equity Consortium,[47] and it was concurrently advising a member of the Equity Consortium in an unrelated transaction. As to the concurrent representation, according to the Complaint, "Evercore advised Insight on its fundraise for its Fund XII and Growth Buyout Fund (valued at $20 billion), an engagement that seemingly began in or around May 2021 and continued through the Transaction."[48] Evercore's fee for its advisory services to the Special Committee was $3 million, with an additional $7 million payment subject to the Special Committee's discretion.[49]

In the meetings that followed, the Special Committee repeatedly instructed Evercore to review J.P. Morgan's outreach efforts.[50] On July 28, 2021, J.P. Morgan submitted a

---

[47] A69 (Compl. ¶ 95) (referring to, in addition to Nordic, Insight Venture Partners, L.P. ("Insight"), GIC Pte. Ltd. ("GIC"), and 22C Capital LLC ("22C")). *See also* A290 (Cumings Aff., Ex. 1) (Proxy at 53) (disclosing Evercore's advisory fees from members of the Equity Consortium in the preceding years).

[48] A69–A70 (Compl. ¶ 96) (internal citations omitted).

[49] A70 (Compl. ¶ 98). Plaintiffs interpreted this fee structure to mean that "Evercore's fee was entirely based upon a successful conclusion of a transaction[.]" A71 (Compl. ¶ 98).

[50] A71 (Compl. ¶ 99) (noting that the "Committee discussed the importance of the review and analysis by Evercore . . . of the buyer outreach and market check conducted by JP Morgan to date.") (internal quotation marks and citation omitted); A74 (Compl. ¶ 104) (detailing that on July 28, 2021, the Special Committee told Evercore to continue its review of J.P. Morgan's process by specifically "determin[ing] whether there were potential financial and strategic buyers that should have been, but were not yet, contacted, and the extent to which JP Morgan engaged potential buyers in meaningful dialogue.") (internal quotation marks and citation omitted).

summary of relationships disclosure in which it disclosed business that it had previously conducted with Nordic, which generated $15–$16 million in fees for J.P. Morgan. The disclosure did not include J.P. Morgan's prior business with members of the Equity Consortium and other co-investors (whose identities were likely known at that time) that generated tens of millions of dollars in fees.[51] J.P Morgan disclosed those conflicts to the board on August 30, 2021, two weeks after the parties had signed the merger agreement. According to Plaintiffs, there was no indication that the Special Committee ever asked J.P. Morgan whether it had any relationship with Nordic's co-investors.

On July 30, 2021, Dunleavy informed the Special Committee that he and other rollover participants (such as Hoffmann) had also hired Latham as their counsel in negotiating their rollovers. During this period, Dunleavy informed the Special Committee that he was willing to participate in an equity rollover of up to $400 million and Hoffmann was willing to roll over up to $300 million in equity even though Nordic was not likely to proceed unless Dunleavy agreed to roll over at least $700 million.[52]

On August 9, 2021, the Special Committee learned that Nordic had only raised $2.2 billion in equity financing for the acquisition — short of the projected $3.5 billion. Consequently, on August 10, Nordic verbally informed J.P. Morgan that a price of $44 per share was no longer feasible because of its failure to secure additional equity financing.

---

[51] A74–A75 (Compl. ¶ 106). *See also* A75 (Compl. ¶ 108) (detailing that "since July 2019, JP Morgan had received fees of $78 to $83 million from business with Insight, $250-$270 million from business with GIC, and $20-$30 million from business with 22C.") (internal citation omitted). On July 28, 2020, Insight, one of Nordic's co-investors, signed an NDA with Inovalon. A75 (Compl. ¶ 106).

[52] A78 (Compl. ¶ 113) (citing A265 (Cumings Aff., Ex. 1) (Proxy at 28)).

Therefore, Nordic planned to resubmit an updated indication of interest at $40.50 per share and a requirement that Dunleavy increase his equity rollover to $1 billion.[53]

The Special Committee, upon learning of this development, determined that accepting Nordic's offer at $40.50 per share would not be in the best interest of the Company and its stockholders and that it would also not approve any transaction in which Dunleavy was required to roll over more than $700 million in equity. Later that day, Nordic officially submitted its revised proposal of $40.25 per share (instead of $40.50), with a combined rollover from both Dunleavy and Hoffmann of $1.1 billion. The Special Committee concluded that the revised offer was not in the best interests of the Company or its stockholders.

The Special Committee then instructed J.P. Morgan to engage with other interested parties. After looking elsewhere, J.P. Morgan informed the Special Committee that other buyers might be able to offer a price comparable to Nordic's, but they required more time for due diligence. Consequently, the Special Committee instructed J.P. Morgan to continue negotiations with Nordic while simultaneously engaging with other potential buyers.

At an August 13, 2021 meeting, the Special Committee determined that the Company should continue negotiating with Nordic to maintain Nordic's commitment to pursuing a transaction, "particularly at a price of $41 per share or higher," as that "would be in the best interest of the Company."[54] J.P. Morgan presented to the Special Committee

---

[53] A266 (Cumings Aff., Ex. 1) (Proxy at 29).

[54] A88 (Compl. ¶ 135) (internal quotation marks and citation omitted).

16

the state of its outreach attempts to other interested parties: one interested party indicated that it could do a $41 per share offer; however, it required that Dunleavy roll over 80% of the deal proceeds; another interested party had verbally indicated that $42 per share might be too expensive; a third interested party stated that it could potentially approach $42 per share; and two other parties expressed some interest.[55]

Later that same day, on August 13, 2021, Nordic submitted a revised offer of $41 per share, proposing equity rollovers from Dunleavy and Hoffmann of $700 million and $542 million, respectively.[56] The Special Committee, still not satisfied, instructed J.P. Morgan to continue its outreach to other parties. Two days later, on August 15, Nordic submitted its "best and final offer" of $41 per share, which contemplated a $700 million equity rollover from Dunleavy and a $600 million equity rollover from Hoffmann. Nordic also requested that the go-shop provision be eliminated from the proposed merger agreement. In response, the Special Committee convened that day and instructed J.P. Morgan to continue its outreach with other parties.

As of August 16, 2021, there were other remaining bidders that might have been able to offer comparable prices to Nordic, but they needed more time for due diligence. The Special Committee directed Latham to accept the deletion of the go-shop provision in exchange for a smaller termination fee, a larger reverse termination fee, and an extended

---

[55] A88–A89 (Compl. ¶ 136).

[56] A89 (Compl. ¶ 137). The Plaintiffs allege that "[t]he Proxy falsely stated that the total required rollover was only $1 billion (Dunleavy $700 million, Hoffmann $300 million)." *Id*. (internal citation omitted).

outside date. At this point, according to Plaintiffs, Dunleavy continued to negotiate with Nordic, and he told the board that the specific terms of his rollover agreement were not yet acceptable to him. J.P. Morgan continued its market outreach. On August 17, "Dunleavy advocated for the Transaction[]" at a board meeting.[57]

### 3. The Special Committee and the Board Approve the Transaction

At an August 18, 2021 meeting of the Company's independent directors, J.P. Morgan and Evercore orally opined that Nordic's offer at $41 per share was fair, from a financial point of view, to Inovalon's public stockholders. The Proxy states that on this date, Evercore delivered to the Special Committee an update to its written memorandum "disclosing [its] material relationships with respect to several potential counterparties, including [Nordic] and Dr. Dunleavy."[58] That same day, the Special Committee recommended that the board approve the Transaction. The independent directors and the audit committee approved the Transaction.[59] Dunleavy and Hoffmann, and their affiliates, concurrently executed agreements laying out the terms of their equity rollovers. Prior to the Transaction, Dunleavy and Hoffmann held 11% and 9.4% of Inovalon's shares, respectively.[60] Following the rollover agreements, Dunleavy and Hoffmann would hold

---

[57] A95 (Compl. ¶ 150).

[58] A268 (Cumings Aff., Ex. 1) (Proxy at 31).

[59] The Proxy states that "the independent members of the Company Board (consisting of all members of the Company Board other than Dr. Dunleavy, who recused himself) unanimously approved and declared advisable the Merger Agreement . . . ."). A269 (Cumings Aff., Ex. 1) (Proxy at 32).

[60] A98 (Compl. ¶ 156).

18

15.6% and 13.4% of the post-Transaction entity, respectively.[61]

Annex B, a supplement to Dunleavy's equity rollover agreement, was referred to as the "MIP Term Sheet."[62] It outlined Nordic's commitment to implement a management incentive plan (or "MIP") following the Transaction's closing. Under the MIP term sheet, the MIP would hold equity interests consisting of 8% of the fully diluted common equity of the post-Transaction entity. Additionally, the MIP would grant 5% of the interests to employees at closing and reserve an additional 3% for future issuances. Despite Dunleavy's equity rollover agreement stating that the post-Transaction entity would implement a MIP consistent with the term sheet after closing,[63] the MIP term sheet explicitly stated that it was not legally binding, did not contain all of the terms and conditions applicable, was subject to material change(s), and was "being distributed for discussion purposes only."[64]

### 4. Inovalon Issues its Proxy and the Minority Stockholders Approve the Transaction

Inovalon filed the Proxy soliciting stockholder approval of the Transaction on October 15, 2021. On November 5, 2021, it issued supplemental disclosures that stated there were no discussions between Nordic's and Inovalon's management regarding post-

---

[61] *Id.*

[62] A611 (Cumings Aff., Ex. 14) (Annex B to Terms and Conditions of [the LP] Agreement).

[63] A620 (Cumings Aff., Ex. 14) (Annex B to Terms and Conditions of [the LP] Agreement, at 9) ("Upon or as soon as practicable after the Closing, the Company will implement a MIP on terms and conditions consistent with those set forth in MIP Term Sheet attached as Annex I hereto.").

[64] A621 (Cumings Aff., Ex. 14) (Annex B, Project Ocala, Management Incentive Plan Term Sheet).

Transaction employment other than those regarding Dunleavy's equity rollover.[65]   On November 16, at a special class meeting of Inovalon stockholders, its Class A and Class B stockholders voted separately to approve the merger, with over 99% of the Company's minority stockholders voting to approve the Transaction.[66]

### D. Court of Chancery Proceedings

Following the Transaction's approval, Plaintiffs made a demand for books and records pursuant to Delaware General Corporation Law ("DGCL") § 220.[67]   Inovalon produced the responsive documents.  Plaintiffs then filed the Complaint on August 9, 2022 asserting five counts.  In Count I, Plaintiffs alleged that the Dunleavy Defendants breached their fiduciary duties as controllers by negotiating disparate consideration in the merger. In Count II, Plaintiffs alleged that the board breached their fiduciary duties by approving a merger that was unfair to minority stockholders and by issuing a misleading proxy.  In Count III, Plaintiffs alleged that Dunleavy breached his fiduciary duty as CEO by negotiating for himself non-ratable benefits.[68]   In Count IV, Plaintiffs alleged that the Dunleavy Defendants and the Hoffmann Defendants were unjustly enriched by the Transaction.  Lastly, in Count V, Plaintiffs alleged that Inovalon and the board breached the Company's charter because the Transaction treated Class A and Class B stockholders unequally in connection with an uninformed stockholder vote.

---

[65] A102 (Compl. ¶ 165).  The trial court mistakenly stated that Inovalon issued the supplemental disclosures on November 15, as opposed to November 5.  Bench Ruling at 19.

[66] A117 (Compl. ¶ 188 n.186) (citing Inovalon's Form 8-K (Nov. 16, 2021)).

[67] Bench Ruling at 19.

[68] A136–A137 (Compl. ¶¶ 242–47).

Defendants moved to dismiss the Complaint under Rule 12(b)(6). The parties then stipulated to a voluntarily dismissal of the Hoffmann Defendants without prejudice. The motions were fully briefed as to the remaining defendants, and the court heard oral argument on April 5, 2023.

Following oral argument, the court issued a bench ruling on July 31, 2023, in which it held that the requirements of *MFW* were met and granted Defendants' motions to dismiss in their entirety with prejudice. Plaintiffs challenged only three of *MFW's* requirements: the *ab initio* requirement; the Special Committee's duty of care; and the informed stockholder vote requirement.

### 1. The Ab Initio Requirement

As to the *ab initio* requirement, Plaintiffs argued that Inovalon failed to condition the Transaction *ab initio* on the approval of the Special Committee. The trial court first determined that "*MFW*'s procedural requirements extend to one-sided conflicted controller transactions."[69] It then relied on two decisions from this Court to determine the contours of the *ab initio* requirement: *Flood*[70] and *Olenik*.[71] In *Flood*, this Court clarified that *MFW*'s *ab initio* requirement is satisfied if the controller conditions its offer on the key protections "at the germination stage" of the negotiations process — such as when the committee is selecting its advisors, establishing its method of proceeding, and beginning

---

[69] Bench Ruling at 22.

[70] *Flood*, 195 A.3d 754.

[71] *Olenik v. Lodzinski*, 208 A.3d 704 (Del. 2019).

diligence.[72]    In *Olenik*, this Court held that the plaintiff had pled facts to support a reasonable inference that *MFW*'s procedural protections were not put in place early enough, *i.e.* before substantive economic negotiation occurred.

The trial court here found that the conflicts did not arise until Nordic "formally" requested that Dunleavy participate in an equity rollover as part of its written offer on July 21, 2021.[73]  This request did not occur until after the Special Committee had been formed on July 18.  Although Nordic had suggested that it would "expect" a similar equity rollover in initial negotiations with Dunleavy on July 5, the rollover was not part of Nordic's July 12 indication of interest to acquire Inovalon for $43 per share, or its July 14 $44 per share offer, and the parties, at that stage, "had not made it to 'advanced negotiations[.]'"[74]  The trial court was "content" that the *MFW* protections operated as they should have in this circumstance.

### 2.  *The Special Committee's Duty of Care*

The trial court next addressed Plaintiffs' contention that the Special Committee breached its duty of care in three ways:  (i) by selecting conflicted advisors; (ii) by allowing Dunleavy and J.P. Morgan to negotiate directly with Nordic; and (iii) by forgoing the go-

---

[72] *Flood*, 195 A.3d at 763.

[73] Bench Ruling at 27.

[74] *Id.* As the Chancellor observed, even in August 2021, the Special Committee "instructed J.P. Morgan to actively engage in buyer outreach with other interested parties." *Id.* at 13.  Appellees also argued to this Court that it would not have made sense to stop in the middle of an active outreach process at that point — to form a Special Committee — when only one bidder had expressed interest in a rollover.  Oral Argument, at 30:45–31:30, https://vimeo.com/913043373.

shop provision in the merger agreement.[75] The trial court determined that none of these arguments was persuasive.

The court first considered whether the Special Committee breached its duty of care in its hiring and management of conflicted advisors. Starting with Latham, it held that Latham's prior month-long representation of Inovalon in June 2021 was "the kind of relatively minor and infrequent representation that generally is difficult to conclude rises to the level of a conflict that implicates a duty of care violation."[76] Moreover, Latham's prior representation was disclosed in the Proxy. The court was "slightly more trouble[ed]" by Latham's concurrent conflicts with Nordic on unrelated deals. Nonetheless, it concluded that the allegations failed to cast doubt on the reasonableness and good faith nature of the Special Committee's decision to hire Latham because Latham represented that it did not have any material conflicts and there were no facts suggesting gross negligence by the Special Committee.

The court next focused on Plaintiffs' allegations concerning Evercore's conflicts. Concerning Evercore's and its affiliates' prior dealings with Nordic and its affiliates on unrelated transactions, the court recognized the business reality "that most financial advisors have relationships with major private equity firms."[77] Evercore represented to the Special Committee that it did not have any material conflicts and, in the court's opinion, its disclosures were adequately vetted by the Special Committee. Therefore, the trial court

---

[75] Bench Ruling at 28–29.

[76] *Id.* at 30.

[77] *Id.* at 31.

concluded that Plaintiffs had not alleged that the Special Committee was grossly negligent in retaining Evercore.

In analyzing J.P. Morgan's alleged conflicts, the trial court summarily held that, like Latham and Evercore, Plaintiffs failed to allege facts sufficient to show that the Special Committee was grossly negligent in retaining J.P. Morgan. Despite J.P. Morgan's alleged concurrent and prior representations of Nordic-affiliated entities, the Special Committee hired Evercore "to help with the process."[78] The Special Committee had received the information it needed and "layered on advisory services from multiple advisors in order to mitigate the possibility that any one immaterial conflict even could taint the process."[79] Therefore, the court was satisfied that the allegations did not sufficiently impugn the Special Committee's duty of care.

The trial court next addressed the claim that the Special Committee was grossly negligent in allowing Dunleavy and J.P. Morgan to negotiate with Nordic given their conflicts, and that it improperly delegated Inovalon's entire negotiation to them. As to J.P. Morgan, the court reasoned that it had already determined that the allegations surrounding J.P. Morgan's alleged conflicts were unpersuasive. As to Dunleavy, the trial court stated that it did not find this argument persuasive either: "Dunleavy's employment and equity rollover terms remained fluid throughout the process, and his conflicts were disabled by the *MFW* protections before substantive negotiations took place as to those issues."[80]

---

[78] *Id.*

[79] *Id.* at 32.

[80] *Id.* at 33.

Addressing the Plaintiffs' broader argument concerning the Special Committee's delegation of the negotiations to Dunleavy and J.P. Morgan, the trial court reiterated that the Special Committee's conduct must be evaluated under the "lens of due care[]" and, often, "no single factor will completely resolve the analysis."[81] It determined that the Special Committee "undertook substantial efforts to evaluate the potential field of buyers, pushed Nordic to increase its offer from $40.25 per share to $41 per share, and limited Dunleavy's equity rollover."[82] The court then rejected the claim holding that "[m]aking good faith decisions, while having J.P. Morgan carry out marching orders, does not rise to the level of gross negligence."[83]

Lastly, the trial court addressed Plaintiffs' claim that the Special Committee's decision to eliminate the go-shop provision constituted gross negligence. The court rejected the claim observing that "Delaware courts have held that foregoing a go-shop [provision] or agreeing to a no-shop provision is not *per se* unreasonable."[84] Here, the Special Committee eliminated the go-shop provision in exchange for concessions from Nordic namely, a reduced seller termination fee, an increased buyer termination fee, and an extended outside date.[85] Plaintiffs' argument thus boiled down to "their disagreement

---

[81] *Id.*

[82] *Id.* at 35.

[83] *Id.*

[84] *Id.* at 36.

[85] *Id.* The trial court also noted that the Special Committee's timing in dropping the go-shop provision was relevant:

> By this point, the special committee had instructed J.P. Morgan to conduct outreach to over 30 potential bidders, 13 of which signed NDAs and three of which submitted bids before declining to proceed. Despite all these efforts, no other bidder was

25

with the value that the special committee placed on these exchanged terms[.]"[86]

In summarizing its due care analysis, the court held that Plaintiffs' allegations failed to impugn the Special Committee's duty of care. It held:

> The special committee convened 23 times between July and August of 2021 and engaged with its advisors. It considered its advisors' feedback. It conducted extensive third-party outreach. When Nordic retracted its initial bid and reduced its offer, the special committee successfully bid up the deal price to $41 per share with favorable non-economic terms. So in these circumstances, plaintiffs fail to plead facts making it reasonably conceivable that the special committee acted with gross [negligence].[87]

### 3. *The Sufficiency of the Stockholder Vote*

Plaintiffs alleged that the Proxy was materially deficient in six ways in failing to disclose: (i) J.P. Morgan's and Evercore's conflicts; (ii) the non-ratable benefits to management from the Transaction; (iii) that Dunleavy and Nordic believed Inovalon was worth at least $44 per share; (iv) that J.P. Morgan conducted third-party outreach, not Evercore; (v) that Dunleavy's and Hoffmann's ownership interests increased in the post-Transaction entity; and (vi) that there was continued third-party interest in acquiring Inovalon. The trial court rejected each assertion.

First, the trial court summarily dispensed with the allegedly material omission of J.P. Morgan's and Evercore's conflicts because it had already determined, in assessing the

---

willing to give Inovalon more than Nordic had offered. By conducting a market check, the special committee apprised itself of any other potential third-party interest before signing. So it's not reasonably conceivable to me that agreeing to drop the go-shop provision constituted gross negligence.

*Id.* at 37.

[86] *Id.*

[87] *Id.* at 37–38.

Special Committee's alleged breach of the duty of care, that those conflicts were not material.[88]

Second, the trial court addressed the Proxy's omission of the MIP. It reasoned that whether the MIP Term Sheet would have been a material omission depended on whether it was better classified as a "concrete side deal" for Dunleavy or whether it was a proposed but not concrete future business plan.[89] It held that the MIP was "merely a term sheet that the parties agreed to attempt to negotiate further."[90] Moreover, the term sheet explicitly stated that it was not legally binding, it did not contain all of the terms and conditions applicable, it was subject to material change(s), and it was being distributed for discussion purposes only.[91] The court reasoned that nothing in the merger agreement or ancillary documents required that the MIP be implemented according to the parties' positions laid out in the term sheet and, at the time of the stockholders' vote, "the MIP was still gestational."[92]

Third, the trial court addressed the Proxy's omission of Dunleavy's and Nordic's belief that Inovalon was worth at least $44 per share. It held that Plaintiffs failed to allege any non-conclusory facts to support this allegation. The Proxy adequately disclosed that

---

[88] *Id.* at 39 (holding that, "since I've already found that those allegations weren't entirely persuasive, I do not believe that the precise information that plaintiffs deem a disclosure deficiency would have altered the total mix of information available to stockholders.").

[89] *Id.* at 40.

[90] *Id.* at 42.

[91] *Id. See also* A621 (Cumings Aff., Ex. 14) (Annex B, Project Ocala, Management Incentive Plan Term Sheet).

[92] Bench Ruling at 43.

Nordic's second offer was $44 per share and that it later decreased that offer. The trial court further reasoned that, although the Special Committee's meeting minutes from August 9, 2021 state that Dunleavy was "prepared" to set his equity rollover at $700 million at $44 per share, this did not say anything about Dunleavy's purported belief about Inovalon's value.

Fourth, the court addressed Plaintiffs' allegations concerning the roles of J.P. Morgan and Evercore in advising the Special Committee and whether the Proxy overstated Evercore's role, thereby giving the misleading impression that it was able to mitigate J.P. Morgan's conflicts. The trial court held that Plaintiffs' position is hard to square with the "practical realties[]" of the Transaction which included the fact that J.P. Morgan had a one-month head start over Evercore and it was evident, based on the allegations, that Evercore did, in fact, engage in the outreach process. Further, the court had already determined that J.P. Morgan was not materially conflicted.

Fifth, the trial court focused on the Proxy's omission of the fact that Dunleavy's and Hoffmann's combined equity rollover increased from 20.4% of Inovalon's pre-Transaction equity to 29% of the post-Transaction equity. The Proxy disclosed Dunleavy's and Hoffmann's individual rollover agreements, the number of shares they rolled over, and the number of post-Transaction shares they received. The trial court did not view it as necessary for the Company to disclose the precise percentages that Dunleavy and Hoffmann would have received in the post-Transaction entity.

Sixth, and finally, the trial court turned its attention to the Proxy's omission of continued third-party interest in acquiring Inovalon. The Proxy stated that, as of August

28

13, 2021, "no potential counterparty had expressed an interest in offering a price at or above $41 per share."[93] Plaintiffs pointed to J.P. Morgan's August 13, 2021 presentation to the Special Committee that identified three potentially interested parties. However, the court determined that the Proxy disclosure was consistent with J.P Morgan's presentation to the Special Committee because none of the other supposedly interested parties had made a better offer than Nordic's (at $41 per share), and none of them ultimately made an actual offer. It concluded that the Proxy's omission of other nonbinding informal communications was not material.

In sum, the trial court held that Plaintiffs failed to plead sufficient facts to demonstrate that the Transaction did not comply with the *MFW* framework, and thus, the Transaction was subject to business judgment review. Accordingly, the court held that Plaintiffs failed to state a claim as to Counts I, II, and III.

Lastly, the trial court held that Plaintiffs' remaining counts similarly rose and fell with the *MFW* analysis. The court found that the unjust enrichment claim against the Dunleavy Defendants in Count IV was predicated on the same facts that formed the basis of Plaintiffs' claims for breach of fiduciary duty against the Dunleavy Defendants. Because those claims were deficient, so were the unjust enrichment claims. Count V alleged that Inovalon and the board violated provisions of Inovalon's charter requiring that Class A and Class B shares be treated equally in a change-of-control transaction. Plaintiffs argued that although Inovalon did conduct separate voting for Class A and Class B, these

---

[93] A267 (Cumings Aff., Ex. 1) (Proxy at 30).

29

voters were uninformed and that therefore, the votes were invalid.  The court dismissed this count because it had already determined that the minority stockholders were adequately informed by the Proxy when they voted to approve the Transaction.

*E.  Contentions on Appeal*

Appellants argue that judicial cleansing is unavailable under the *MFW* framework for two separate reasons.  First, they say that Dunleavy engaged in substantive economic negotiations with Nordic before the Special Committee's formation — thereby violating the *ab initio* requirement of the *MFW* framework.  Because we reverse on the second ground, we do not address this claim of error.

Instead, we focus our attention on Appellants' second argument that judicial cleansing under the *MFW* framework is unavailable because the Proxy omitted material information that rendered the minority stockholders' vote to approve the Transaction uninformed.  They base this claim on three allegedly material omissions in the Proxy discussed below.

## II.     STANDARD OF REVIEW

"We review *de novo* the dismissal by the Court of Chancery of a complaint under Rule 12(b)(6)."[94]

## III.     ANALYSIS

In the last decade, our Court has issued several decisions concerning certain procedural devices that could alter the burden of proof in a conflicted transaction.  In *MFW*,

---

[94] *Malpiede v. Townson*, 780 A.2d 1075, 1082 (Del. 2001) (internal citation omitted).

a case involving a controller freeze-out transaction, we adopted the following standard:

> To summarize our holding, in controller buyouts, the business judgment standard of review will be applied *if and only if*: (i) the controller conditions the procession of the transaction on the approval of both a Special Committee and a majority of the minority stockholders; (ii) the Special Committee is independent; (iii) the Special Committee is empowered to freely select its own advisors and to say no definitively; (iv) the Special Committee meets its duty of care in negotiating a fair price; (v) the vote of the minority is informed; and (vi) there is no coercion of the minority.[95]

In *In re Tesla Motors, Inc. S'holder Litig.*,[96] we reiterated that *MFW*'s procedural protections must be "established *prior to trial*[.]"[97] And when they are established, the transaction is then afforded the deferential business judgment standard of review. Under Delaware's business judgment rule, "'the board's decision will be upheld unless it cannot be attributed to any rational business purpose.'"[98] In our most recent decision in *In re Match Grp., Inc. Derivative Litig.*,[99] we held that where a controlling stockholder stood on both sides of a transaction with a controlled corporation and received a non-ratable benefit, entire fairness was the presumptive standard of review.[100]

Here, Appellants assert that *MFW* "cleansing" is unavailable because the

---

[95] *MFW*, 88 A.3d at 645 (emphasis in original). In *Flood*, we clarified that "[t]o avoid one of *Lynch*'s adverse consequences—using a majority-of-the-minority vote as a chit in economic negotiations with a Special Committee—*MFW* reviews transactions under the favorable business judgment rule if 'these *two protections are established up-front*.'" 195 A.3d at 762 (quoting *MFW*, 88 A.3d at 644) (emphasis added)).

[96] 298 A.3d 667 (Del. 2023).

[97] *Id.* at 708 (quoting *MFW*, 88 A.3d at 646 (emphasis in original)).

[98] *Id.* (quoting *In re Walt Disney Co. Derivative Litig.*, 906 A.2d 27, 74 (Del. 2006) (internal quotation marks and citation omitted)).

[99] 2024 WL 1449815 (Del. 2024).

[100] *Id.* at *1.

stockholder vote was not fully informed. Appellants allege that the Proxy failed to adequately disclose: (i) the MIP, a material and non-ratable benefit providing Dunleavy and others with hundreds of millions of dollars in value; (ii) Evercore's and J.P. Morgan's concurrent representations of Nordic and members of the Equity Consortium and their respective affiliates, as well as J.P. Morgan's fees earned from members of the Equity Consortium and their affiliates in prior representations; and (iii) Evercore's role in the market outreach to potential bidders. We address each in turn.

A. *The Proxy Adequately Disclosed the MIP*

As to the MIP term sheet, Appellants challenge the trial court's determination that it would not have altered the "total mix" of information available to stockholders.[101] That was because the MIP term sheet was best classified as a proposal, as opposed to a concrete future business plan and, accordingly, did not require disclosure. This is a close call, but we hold that the trial court did not err in rejecting this claim.

The existence of an equity incentive program for certain employees in the post-Transaction entity was disclosed to stockholders. The Proxy provided a chronology of the negotiation process prior to the Transaction. It stated that the Special Committee held meetings with its advisors in which they discussed updates on "the Company's management's proposal regarding treatment of equity incentives for employees[.]"[102] The Proxy indicated that Dunleavy was involved in these discussions: "[a]t the end of the

---

[101] Bench Ruling 39–43 (discussing *City Pension Fund for Firefighters and Police Officers in the City of Miami v. The Trade Desk, Inc.*, 2022 WL 3009959 (Del. Ch. 2022)).

[102] A264 (Cumings Aff., Ex. 1) (Proxy at 27).

meeting, the Special Committee invited Dr. Dunleavy to join the meeting to provide his views to the Special Committee regarding the potential treatment of equity incentive compensation in connection with a potential sale transaction."[103]  Additionally, an FAQ document that was attached as an exhibit to a supplemental proxy filing[104] disclosed that "there will be a profit share equity unit incentive program that will give eligible associates access to the upside of the Company."[105]  The Proxy's Q&A section also urged readers to review the Form 13E-3 and related exhibits.[106]

Appellants point to the Special Committee's meeting minutes claiming that the Proxy's references to equity incentives for employees refer exclusively to the treatment of unvested equity under *existing* employee incentive programs in the Transaction as opposed to the MIP.  But, the minutes could be more broadly read as they state:

> Dr. Dunleavy presented a detailed summary of his *proposed* treatment of unvested outstanding equity for employees.  Dr. Dunleavy stated that in his view the proposed acceleration of vesting and escrow arrangement to support *future* payments of incentive compensation would be crucial to achieving the continued focus and engagement of key Company employees required to deliver the performance of the Company *anticipated* as reflected in management's projections.[107]

Following discussion, members of the Special Committee concluded that Dr.

---

[103] A266 (Cumings Aff., Ex. 1) (Proxy at 29).

[104] A670 (Cumings Aff., Ex. 24) (Additional Proxy Soliciting Material on Schedule 14A) (Aug. 19, 2021).  As noted by Appellees, the proxy supplement was filed publicly two months before the Proxy, it was available on the SEC's website, the Company's website, and to any stockholder that requested a copy from the Company.  Answering Br. at 41–42.

[105] A673 (Cumings Aff., Ex. 24) (Additional Proxy Soliciting Material on Schedule 14A) (Aug. 19, 2021).

[106] A256 (Cumings Aff., Ex. 1) (Proxy at 19).

[107] A597 (Cumings Aff., Ex. 13) (Minutes of a Meeting of the Special Committee dated August 2, 2021) (emphasis added).

Dunleavy's proposal *would provide* sufficient incentives to key Company employees to increase the likelihood that conditions to closing will be satisfied and anticipated *future* performance will be achieved in each case without compromising the benefits of a transaction to the Company's stockholders. The Special Committee instructed Latham to revise the draft merger agreement . . . and authorized Dr. Dunleavy to discuss his proposal with representatives of Nordic Capital.[108]

Appellants also point out that Annex B to Dunleavy's rollover agreement states that the Company will implement a MIP consistent with the term sheet.[109] Annex B was omitted from the Proxy. But Annex B to the term sheet explicitly stated that "[t]his Term Sheet is not legally binding, does not contain all of the terms and conditions applicable to the contemplated arrangements described herein, is subject to material change and is being distributed for discussion purposes only."[110] The Proxy did contain the form of rollover agreement that revealed that Dunleavy was rolling over $700 million in equity.[111] The stockholders therefore knew that he would have a significant stake in the resulting entity. The Proxy also explicitly stated that Dunleavy would continue as CEO in the post-Transaction entity.[112] Thus, although the exact terms of the MIP were not disclosed in the

---

[108] *Id.* (emphasis added).

[109] Opening Br. at 35. Appellants argue that the "MIP was a legally binding Transaction Term[]" because the LP Agreement provided that "[u]pon or as soon as practicable after the Closing, the Company *will implement a MIP* on terms and conditions consistent with those set forth in [the] MIP Term Sheet." Reply Br. at 9 (emphasis in original) (internal quotation marks and citation omitted).

[110] A621 (Cumings Aff., Ex. 14) (Annex B, Project Ocala, Management Incentive Plan Term Sheet).

[111] A469 (Cumings Aff., Ex. 1) (Annex A to Rollover Agreement).

[112] A228 (Cumings Aff., Ex. 1) (Proxy Introduction) ("Dr. Dunleavy will continue to be a substantial shareholder in the Company, serve on the Company Board and continue as Inovalon's CEO.").

Proxy, the stockholders were reasonably informed of the existence of equity incentives that would be provided to certain employees, including Dunleavy, who would continue in the post-Transaction entity.

### B. The Proxy Failed to Adequately Disclose the Nature and Extent of the Special Committee's Advisors' Conflicts

Appellants contend that the trial court erred when it rejected their disclosure claims concerning J.P. Morgan's and Evercore's conflicts with Nordic and members of the Equity Consortium.[113] The trial court summarily held: "I've already discussed one of those categories, J.P. Morgan and Evercore's conflicts. And since I've already found that those allegations weren't entirely persuasive, I do not believe that the precise information that plaintiffs deem a disclosure deficiency would have altered the total mix of information available to stockholders."[114] Thus, the trial court decided that the Special Committee was not grossly negligent in retaining and managing its advisors and then summarily dispensed with the disclosure issues by relying on that duty of care analysis.

In *Brookfield*,[115] we held that the trial court's duty of care analysis did not adequately address the separate disclosure issues which required an assessment of the materiality of the conflicts from the perspective of the stockholders. In this case, we similarly hold that the trial court's due care analysis concerning the retention and management of the advisors did not sufficiently address all of the disclosure issues — some

---

[113] Opening Br. at 41.

[114] Bench Ruling at 38–39.

[115] *City of Dearborn Police and Fire Revised Ret. Sys. v. Brookfield Asset Mgmt., Inc.*, 2024 WL 1244032 (Del. 2024).

of which arose after the advisors' retention.[116]

"'Materiality is to be assessed from the viewpoint of the 'reasonable' stockholder, not from a director's subjective perspective.'"[117] A special committee's advisor's conflicts are uniquely important considerations for minority stockholders when deciding how to vote: "it is imperative for the stockholders to be able to understand what factors might influence the financial advisor's analytical efforts . . . ."[118] Moreover, "'[b]ecause of the central role played by investment banks in the evaluation, exploration, selection, and implementation of strategic alternatives,'" Delaware courts have required full disclosure of investment banker compensation and potential conflicts.[119] As we explain below, we hold that the Proxy failed to adequately disclose Evercore's and J.P. Morgan's conflicts.

### 1. Evercore's Concurrent Conflicts

We first address Appellants' contention that the Proxy failed to adequately disclose Evercore's concurrent conflicts. Regarding Evercore and its affiliates, the Proxy disclosed

---

[116] We note that our decision in *Brookfield* came after the Court of Chancery had decided both *Brookfield* and this case and thus, the court did not have the benefit of our decision in *Brookfield* when deciding the similar issues here.

[117] *Millenco L.P. v. meVC Draper Fisher Jurvetson Fund I, Inc.*, 824 A.2d 11, 18 (Del. Ch. 2002) (quoting *Arnold v. Soc'y for Sav. Bancorp, Inc.*, 650 A.2d 1270, 1277 (Del. 1994)).

[118] *Brookfield*, 2024 WL 1244032, at *17 (internal quotation marks and citation omitted). *See also In re John Q. Hammons Hotels Inc. S'holder Litig.*, 2009 WL 3165613, at *16 (Del. Ch. 2009) ("There is no rule . . . that conflicts of interest must be disclosed only where there is evidence that the financial advisor's opinion was actually affected by the conflict."); *Millenco L.P.*, 824 A.2d at 15 ("[T]he relevant inquiry is not whether an actual conflict of interest exists, but rather whether full disclosure of potential conflicts of interest has been made.") (internal quotation marks and citation omitted).

[119] *Brookfield*, 2024 WL 1244032, at *17 (quoting *In re Del Monte Foods Co. S'holders Litig.*, 25 A.3d 813, 832 (Del. Ch. 2011)).

the following:

> During the period January 1, 2019 to August 18, 2021, Evercore and its affiliates have not been engaged to provide financial advisory or other services to the Company and Evercore has not received any compensation from the Company during such period. During the period January 1, 2019 to August 18, 2021, Evercore and its affiliates have provided financial advisory services to Nordic Capital X and/or certain of its affiliates and received fees for the rendering of these services in the amount of approximately $9 million. During the period January 1, 2019 to August 18, 2021, Evercore and its affiliates have provided financial advisory services to GIC and certain of its affiliates and received fees for the rendering of these services in the amount of approximately $46 million. During the period January 1, 2019 to August 18, 2021, Evercore and its affiliates have provided financial advisory services to Insight and certain of its affiliates and received fees for the rendering of these services in the amount of approximately $57 million. *Evercore may provide financial advisory or other services to the Company and the Acquiror and their respective affiliates, including Nordic Capital X, GIC, Insight and their respective affiliates, in the future, and in connection with any such services Evercore may receive compensation.*[120]

Evercore provided its initial summary of relationships disclosure on July 29, 2021. It disclosed that it had received approximately $45 million in fees from GIC, but failed "to disclose that it had provided $57 million in services to Insight over the preceding two years."[121] Evercore provided an updated conflicts disclosure on August 18, 2021.[122] Evercore acknowledged that during the period from January 1, 2019 to August 18, 2021, it had earned investment banking advisory fees from Insight and GIC. Those fees were disclosed in the Proxy.[123] Evercore also disclosed to the Special Committee that it

---

[120] A290 (Cumings Aff., Ex. 1) (Proxy at 53) (emphasis added).

[121] A75 (Compl. ¶ 107) (internal citation omitted).

[122] A1136 (Cumings Aff., Ex. 33) (Evercore Summary of Relationships) (Aug. 18, 2021).

[123] A69 (Compl. ¶ 95) (citing A290 (Cumings Aff., Ex. 1) (Proxy at 53)).

concurrently represented Nordic on a potential unrelated transaction.[124] Plaintiffs alleged, citing a press release, that this apparently referred to Nordic's exit in Vizrt Group to a new Nordic-led consortium.[125]

They further alleged that Evercore concurrently was advising Insight on its fundraise for its Fund XII and Growth Buyout Fund (valued at $20 billion).[126] They alleged that Evercore alluded to this representation in its August 18, 2021 memorandum.[127] There Evercore acknowledged that "an affiliate of Evercore is currently providing confidential financial advisory services to one of the Relevant Parties on a matter that is unrelated to [Inovalon].[128] On appeal, Appellants reassert their contention that the Proxy failed to adequately disclose Evercore's concurrent representation of (i) Nordic on its exit in Vizrt Group and (ii) Insight on its fundraise.[129]

Appellees assert that the following Proxy's reference to Evercore's concurrent

---

[124] A1137 (Cumings Aff., Ex. 33) (Evercore Summary of Relationships) (Aug. 18, 2021) (stating that, "[i]n addition, we note that one of Evercore's affiliated businesses has been in discussions with Nordic Capital regarding a potential transaction that is unrelated to the Company or this engagement. Such discussions may result in an active engagement in the near term with potential customary fees.").

[125] A68 (Compl. ¶ 94).

[126] A69–A70 (Compl. ¶ 96).

[127] *See generally*, A68 (Compl. ¶ 94) ("Evercore belatedly admitted to the Board in its conflict disclosure that while it was representing the Committee it was also exploring concurrent engagements with Nordic[.]"); A69 (Compl. ¶ 96) ("Evercore acknowledged that it was providing confidential financial advisory services—concurrent with its work for the Special Committee on the Transaction—to one of the Relevant Parties [to the Transaction] on a matter that is unrelated to the Company.") (internal quotation marks and citation omitted).

[128] A1138 (Cumings Aff., Ex. 33) (Evercore Summary of Relationships) (Aug. 18, 2021).

[129] Opening Br. at 44; *see also* A109 (Compl. ¶ 177) (alleging that "Evercore's engagements with Nordic and Insight, which were concurrent with Evercore's engagement by the Special Committee on the Transaction, were not disclosed to stockholders in the Proxy.").

conflicts was sufficient: "*Evercore may provide financial advisory or other services to the Company and the Acquiror and their respective affiliates, including Nordic Capital X, GIC, Insight and their respective affiliates, in the future, and in connection with any such services Evercore may receive compensation.*"[130] The question is whether this disclosure adequately addressed Evercore's concurrent conflicts with Nordic and with Insight, a member of the Equity Consortium.

In *Brookfield,* we held that a similar use of "may" in a proxy disclosure was materially misleading because it failed to provide adequate notice to stockholders of a special committee's financial advisor's then-existing material conflict with a transaction counterparty.[131] In this case, it was similarly misleading for the Proxy to state that Evercore "may" provide advisory services to Nordic and Insight when, in fact, it was providing such services, and thus there was an actual concurrent conflict. Evercore's concurrent representation, in unrelated transactions, of Nordic, the bidder of the Company, and Insight, a co-investor, were material facts.[132] Accordingly, we hold that the Proxy failed to adequately disclose Evercore's concurrent conflicts.

---

[130] A290 (Cumings Aff., Ex. 1) (Proxy at 53) (emphasis added).

[131] *Brookfield*, 2024 WL 1244032, at *18 (holding that "[t]he use of 'may' in the Proxy is misleading because [the financial advisor] had indeed already invested nearly half a billion dollars[,]" and that "[t]his misleading language also makes it less likely that a stockholder would have been prompted to locate [the financial advisor]'s [counterparty] holdings in its publicly filed form 13F.") (internal citation omitted).

[132] *See, e.g., id.* at *18 (observing that "an advisor's concurrent engagement with a transaction counterparty can present legitimate concerns regarding the advisor's objectivity[.]"); *In re PLX Tech. Inc. S'holders Litig.*, 2018 WL 5018535, at *43 (Del. Ch. 2018) (a "[financial advisor]'s ongoing relationship with [a potential bidder] gave it a powerful incentive to maintain good will and not push too hard during the negotiations.") (internal quotation marks and citations omitted), *aff'd*, 211 A.3d 137, 2019 WL 2144476 (Del. 2019) (ORDER).

We reject Appellees' argument that these conflicts did not require disclosure because they involved affiliates of Evercore.[133] First, as Appellants point out, the Complaint alleged that Evercore itself — as opposed to its affiliates — was involved in the challenged representations. The Complaint cites a press release regarding the Nordic/Vizrt Group transaction that stated that "Nordic Capital was advised in the process by, among others, Evercore as financial advisor[.]"[134] Appellants argue further that Evercore stated on its website that it advised Insight on the fundraise.[135] Even if the entities retained were affiliates of Evercore, under Delaware law, there is no brightline rule holding that the work performed by affiliates, or fees received and paid by affiliates, insulates the retained entity from disclosure requirements.[136] Rather, the materiality standard is the operative test as

---

[133] *See* Answering Br. at 48–49 ("To be sure, Evercore did *not* concurrently represent Nordic or other Consortium members while advising the Committee. As Plaintiffs admit, any concurrent work was performed by Evercore's *affiliates*, not Evercore itself, on entirely unrelated matters. No additional disclosure obligation arises in these circumstances.") (emphasis in original) (internal quotation marks and citations omitted).

[134] Reply Br. at 16–17. *See also* A68–A69 (Compl. ¶ 94, n.68) (citing to Press Release), *Nordic Capital exits investment in Vizrt Group to a new Nordic Capital-led consortium to further support successful growth journey* (Dec. 28, 2021), https://www.nordiccapital.com/news-views/press-releases/nordic-capital-exits-investment-in-vizrt-group-to-a-new-nordic-capital-led-consortium-to-further-support-successful-growth-journey/.

[135] Reply Br. at 16–17 (citing A69–A70 (Compl. ¶ 96, n.73)).

[136] Our Court has acknowledged that work performed by an affiliate of a retained entity may present a conflict of interest:

> In our view, the Special Committee established to negotiate the purchase of the block of NL stock did not function independently . . . . The Special Committee's advisors did little to bolster the independence of the principals. The financial advisor . . . was recommended by [a member of the Special Committee] and [was] quickly retained by the full Special Committee. In the past, an *affiliate* bank of [the financial advisor] had derived significant fees from [controller's] controlled companies and at the time of the transaction was affiliated with [a member of the Special Committee]'s current employer.

applied to the well-pled allegations. In addition to the fact that one or more of the representations at issue are alleged to have involved Evercore, as opposed to its affiliates, we note that the Proxy refers to "Evercore and its affiliates" when discussing Evercore's potential conflicts. On this record, we are persuaded that even if some of the work was performed by Evercore's affiliates, the Proxy failed to adequately disclose these concurrent conflicts.[137]

### 2. J.P. Morgan's Concurrent Conflicts

Appellants also challenge the Proxy's omission of J.P. Morgan's concurrent conflicts. The Proxy disclosed the following information concerning J.P. Morgan's conflicts:

> During the two years preceding the date of J.P. Morgan's opinion, neither J.P. Morgan nor its affiliates have had any other material financial advisory or other material commercial or investment banking relationships with the Company, Parent, Meritas Group, Inc., which holds approximately 30% of the capital stock of the Company, GIC Pte. Ltd., Insight Venture Partners, L.P. or 22C Capital LLC. *During the two years preceding the date of J.P. Morgan's opinion, J.P. Morgan and its affiliates have had and continue to have commercial or investment banking relationships with certain affiliates of Parent, including Parent's parent company, Nordic Capital X, as well as certain affiliates of each of GIC Pte. Ltd., Insight Venture Partners, L.P. and 22C Capital LLC, for which J.P. Morgan and such affiliates have received, or will receive, customary compensation. In addition, J.P. Morgan's commercial banking affiliate is an agent bank and a lender under outstanding credit facilities of certain affiliates of GIC Pte. Ltd. and certain affiliates of Insight Venture Partners, L.P., for which it receives customary compensation or other financial benefits. In addition, J.P. Morgan and its affiliates hold, on a proprietary basis, less than 1% of the outstanding common stock of the Company.* During the two year period preceding

---

*Kahn v. Tremont Corp.*, 694 A.2d 422, 429–30 (Del. 1997) (emphasis added).

[137] *See* A290 (Cumings Aff., Ex. 1) (Proxy at 53).

delivery of its opinion ending on August 18, 2021, the aggregate fees recognized by J.P. Morgan from Nordic Capital X were approximately $15.2 million. During the two year period preceding delivery of its opinion ending on August 18, 2021, J.P. Morgan did not recognize any fees from the Company or Parent. In the ordinary course of their businesses, J.P. Morgan and its affiliates may actively trade the debt and equity securities or financial instruments (including derivatives, bank loans or other obligations) of the Company for their own accounts or for the accounts of customers and, accordingly, they may at any time hold long or short positions in such securities or other financial instruments.[138]

According to the Complaint, J.P. Morgan concurrently represented Nordic on at least two other transactions: (i) Nordic's offer of its Intrum AB (publ) shares to institutional investors in June 2021; and (ii) Nordic's potential sale of Veonet GmbH, announced in September 2021 and valued at $2.4 to $3 billion.[139] Additionally, J.P. Morgan "also appeared to be concurrently representing" GIC, a member of the Equity Consortium, on two other transactions: (i) representing GIC portfolio company Pagaya on its backdoor listing through an $8.5 billion merger with special purpose acquisition vehicle ("SPAC") EJF Acquisition Corp., which was announced on September 15, 2021; and (ii) GIC's $240 million investment in Arctic Green Energy, which was announced in late July 2021.[140]

We address Appellants' contention that the amounts of the undisclosed fees from J.P. Morgan's concurrent representations were material facts requiring disclosure. Appellants cite a number of cases suggesting that when a financial advisor faces a conflict,

---

[138] A283 (Cumings Aff., Ex. 1) (Proxy at 46) (emphasis added).

[139] A105 (Compl. ¶ 171).

[140] A105–A106 (Compl. ¶ 171).

42

both the relationship and the amount of fees should be disclosed.[141]  Most recently, in *Brookfield*, we held that a financial advisor's nearly half a billion-dollar holding in a counterparty to the transaction was material and should have been specifically disclosed because it would have been relevant to a stockholder in assessing that advisor's objectivity.[142]  Similarly, in *Rodden v. Bilodeau*, the Court of Chancery held that it was reasonably conceivable that payments in the two years preceding the merger to its financial advisor totaling $9 million (consisting of $4.9 million by the target and $4.1 million by the acquirer) would be deemed material because disclosure of those payments would help the target's stockholders to "contextualize the magnitude of the [financial advisor]'s conflict of interest."[143]

Again, there is no hard and fast rule that requires financial advisors to always disclose the specific amount of their fees from a counterparty in a transaction.[144]  Rather,

---

[141] *See Kihm v. Mott*, 2021 WL 3883875, at *18 (Del. Ch. 2021) ("When a financial advisor faces a conflict, this Court has *generally* required disclosure of the relationship itself *and* the amount of fees the advisor received.") (emphasis added) (citing *In re Saba Software, Inc. S'holder Litig.*, 2017 WL 1201108, at *11 (Del. Ch. 2017) ("What was material, and disclosed, was the prior working relationship and the amount of fees.")), *aff'd*, 276 A.3d 462, 2022 WL 1054970 (Del. 2022) (ORDER).

[142] *Brookfield*, 2024 WL 1244032, at *17.  *See also RBC Cap. Mkts., LLC v. Jervis*, 129 A.3d 816, 860 (Del. 2015) ("[I]t is imperative for the stockholders to be able to understand what factors might influence the financial advisor's analytical efforts . . . .") (internal quotation marks and citation omitted).

[143] *Rodden v. Bilodeau*, C.A. No. 2019-0176, at 20–21 (Del. Ch. Jan. 27, 2020) (TRANSCRIPT). There, the Vice Chancellor also concluded that references to "customary fees" would have been meaningful to stockholders in calculating the amount of past fees only if they knew what fees would be customary for the kind of work performed.  The court was "not inclined to assume that level of familiarity among [the target's] stockholders on this record." *Id.* at 21.

[144] *See, e.g., Assad v. Botha*, 2023 WL 7121419, at *6 (Del. Ch. 2023) ("Generally, the disclosure of the specific fees a financial advisor received from unrelated work for a transactional counterparty is immaterial where the relationship and its rough scale are disclosed.").

43

the materiality standard governs whether a financial advisor's exact amount of fees collected from a counterparty to a transaction requires disclosure.[145] In this case, the Plaintiffs alleged that J.P. Morgan concurrently represented two separate counterparties to the Transaction — Nordic and GIC — on unrelated transactions while representing the Special Committee. The Proxy disclosed the existence of these representations, but it did not disclose the specific amount of fees that J.P. Morgan stood to earn from these representations:

> During the two years preceding the date of J.P. Morgan's opinion, J.P. Morgan and its affiliates *have had and continue to have* commercial or investment banking relationships with certain affiliates of Parent, including Parent's parent company, Nordic Capital X, as well as certain affiliates of each of [GIC], [Insight], and [22C Capital], *for which J.P. Morgan and such affiliates have received, or will receive, customary compensation*. In addition, J.P. Morgan's commercial banking affiliate is an agent bank and a lender under outstanding credit facilities of certain affiliates of [GIC] and certain affiliates of [Insight], for which it receives customary compensation or other financial benefits.[146]

We conclude that the Proxy's statement that J.P. Morgan will receive "customary compensation" in connection with these four concurrent representations is not sufficient. First, absent disclosure of the amount of the fees, the stockholders could not compare J.P. Morgan's concurrent fees from counterparties with the fees collected from the Company

---

[145] *In re Micromet, Inc. S'holders Litig.*, 2012 WL 681785, at *12 (Del. Ch. 2012) ("Nevertheless, Plaintiffs claim that this partial disclosure requires supplementation to provide the actual amounts received by [the financial advisor]. They fail to provide any persuasive explanation, however, as to why the actual amount of fees paid by [the target company] to [the financial advisor] would be material to shareholders or to cite any Delaware case law mandating such disclosures. This is not a situation in which [the target company], apart from [the acquirer], would be a potential source of future business.").

[146] A283 (Cumings Aff., Ex. 1) (Proxy at 46) (emphasis added).

in this Transaction — approximately $42 million.[147]  This lack of disclosure prevented stockholders from contextualizing and evaluating J.P. Morgan's concurrent conflicts of interest.[148]  We hold that it is reasonably conceivable that J.P. Morgan's concurrent conflicts with counterparties to the Transaction would have altered the total mix of information available to stockholders and, therefore, should have been disclosed.[149]

### 3.  J.P. Morgan's Prior Representations Were Not Adequately Disclosed

We turn next to J.P. Morgan's prior representations of Nordic and members of the

---

[147] *Id.* ("For financial advisory services rendered in connection with the Merger, the Company has agreed to pay J.P. Morgan an estimated fee of $42 million, $3.0 million of which became payable to J.P. Morgan at the time J.P. Morgan delivered its opinion and the remainder of which is contingent and payable upon the consummation of the Merger.").

[148] Disclosure of a special committee's advisor's conflicts of interest enables minority stockholders to weigh that advisor's opinion in light of those conflicts:

> Omitting those advisors' conflicts was materially misleading.  The Proxy failed to disclose that [financial advisor #1] was providing services to [counterparty] while advising the Transaction Committee, and that [financial advisor #1]'s services to [counterparty] netted it hundreds of millions of dollars.  It also failed to disclose that [financial advisor #2], retained to provide a fairness opinion, received $14.2 million in fees from [counterparty] engagements.  This information would certainly help [target] stockholders contextualize the financial advisors' potential conflict of interest.  A more balanced disclosure . . . would have significantly altered the total mix of information available to the individual . . . stockholder.

*Allen v. Harvey*, 2023 WL 7122641, at *7 (Del. Ch. 2023) (internal quotation marks and citations omitted).

[149] *See Tornetta v. Maffei*, C.A. No. 2019-0649, at 18–19 (Del. Ch. Feb. 23, 2021) (TRANSCRIPT) (determining that a financial advisor's alleged concurrent representation of a counterparty on an unrelated transaction was a material fact requiring disclosure because that representation was "twice the size" of the transaction at issue and the financial advisor's fees from the concurrent representation "represented the largest source of [that advisor]'s revenues[.]"); *see also In re Art Tech. Grp., Inc. S'holders Litig.*, C.A. No. 5955, at 101–102 (Del. Ch. Dec. 20, 2010) (TRANSCRIPT) (holding that, given the nature of a disclosure in the proxy concerning a financial advisor's prior advisory services to a counterparty to the transaction, there needed to be a supplemental disclosure of that advisor's fees from the counterparty "given the magnitude of the fees on the [counterparty]'s side[.]").

Equity Consortium.[150] Appellants argue that the Proxy failed to adequately disclose nearly $400 million in fees that J.P. Morgan had earned from members of the Equity Consortium in the two years preceding the Transaction.[151] Instead, it only explicitly disclosed that J.P. Morgan received $15.2 million in fees from Nordic in that same two-year span.[152] As noted above, the trial court summarily rejected the claim.[153]

We hold that the Proxy failed to adequately disclose J.P. Morgan's prior conflicts with members of the Equity Consortium.[154] In contrast to the approximately $15.2 million

---

[150] Appellees assert that the prior fees that Appellants claim were omitted "were those [J.P. Morgan] purportedly earned from Consortium members' *affiliates*." Answering Br. at 52 (emphasis in original) (internal citation omitted). Appellants counter that the Complaint cites press releases indicating that all four concurrent engagements directly involved J.P. Morgan, and that three of those engagements related to work performed directly for an Equity Consortium member or Nordic, not one of their affiliates (*i.e.*, its work for Nordic on two transactions and GIC on its Arctic Green investment). A105–106 (Compl. ¶ 171). Based on the record before us, we are not persuaded that Appellees' attempted distinction regarding affiliates of Equity Consortium members should alter our materiality analysis.

[151] Opening Br. at 45.

[152] *Id.*

[153] Bench Ruling at 38–39.

[154] This issue was highlighted at oral argument:

> **The Court**: It does say customary compensation in the Proxy. So your position is the actual amounts have to be disclosed? There are cases that say that the actual amount is not always necessary to be disclosed. Right?
>
> **Appellants' Counsel**: Well, that is certainly right your Honor, but I think when you look at the context . . . I think the fair reading of the Proxy, a reasonable stockholder who picks it up would say, "okay, J.P. Morgan is earning approximately $45 million from this Transaction from the Company, and they have earned a small fraction of that in the preceding two years from Nordic." And sure, what does customary mean? I think the strong implication from the Proxy is that past fees pale in comparison to what J.P. Morgan is earning from this Transaction when it is actually the opposite, when [past fees from members of the Equity Consortium] are many, many, many, many, many times greater than what J.P. Morgan is earning from the Company for advising them on the sale."

Oral Argument, at 17:07–18:23, https://vimeo.com/913043373.

in advisory fees received from Nordic,[155] J.P. Morgan, in the same time period, received

nearly $400 million in fees from members of the Equity Consortium: (i) $250 million to

$270 million from GIC; (ii) $78 million to $83 million from Insight; (iii) and $20 million

to $30 million from 22C Capital.[156] Instead of explicitly disclosing J.P. Morgan's fees

ranging from $348 to $383 million received from members of the Equity Consortium in

the same time period , the Proxy stated that:

> During the two years preceding the date of J.P. Morgan's opinion, J.P.
> Morgan and its affiliates have had and continue to have commercial or
> investment banking relationships with certain affiliates of Parent, including
> Parent's parent company, Nordic Capital X, as well as certain affiliates of
> each of GIC Pte. Ltd., Insight Venture Partners, L.P. and 22C Capital LLC,
> for which J.P. Morgan and such affiliates have received, or will receive,
> customary compensation. In addition, J.P. Morgan's commercial banking
> affiliate is an agent bank and a lender under outstanding credit facilities of
> certain affiliates of GIC Pte. Ltd. and certain affiliates of Insight Venture
> Partners, L.P., for which it receives customary compensation or other
> financial benefits.[157]

Although the Proxy stated that J.P. Morgan has "had and continue[d] to have

commercial or investment banking relationships" with Nordic and members of the Equity

Consortium, for which it and its affiliates will receive "customary compensation[,]" this

---

[155] A283 (Cumings Aff., Ex. 1) (Proxy at 46).

[156] A104 (Compl. ¶ 170).

[157] A283 (Cumings Aff., Ex. 1) (Proxy at 46). According to Plaintiffs, J.P. Morgan's initial conflicts disclosure on July 28, 2021, listed only business it had previously conducted with Nordic which generated fees of $15–16 million. A74–A75 (Compl. ¶ 106). That disclosure omitted the relationships with Equity Consortium members. The Special Committee allegedly did not inquire about such relationships. It was not until August 30, 2021, two weeks after the merger agreement was executed, that J.P. Morgan informed the Special Committee that "it had in fact earned up to nearly $400 million in fees from Nordic and its co-investors in just the last two years (ending June 30, 2021 no less)." A120–A121 (Compl. ¶ 196). Appellants argue that although J.P. Morgan identified those fees as relevant in its disclosure memorandum, "[t]he Board simply chose to omit them." Reply Br. at 20.

disclosure created a misleading impression as to the "rough scale" of the omitted fees.[158] The undisclosed fees were roughly twenty-five times the disclosed fees and ten times the fees earned in the Transaction. By disclosing the amount of fees earned in the prior two years from Nordic — namely $15.2 million — stockholders could be misled into thinking that the undisclosed fees earned in the concurrent representations were of a similar magnitude.

### C. The Proxy's Description of Evercore's Role in the Market Outreach

Finally, we address the Proxy's disclosure of Evercore's role in the third-party market outreach. Appellants contend that J.P. Morgan was solely responsible for conducting market outreach and, consequently, the Proxy misleadingly implied that Evercore had a substantive role in conducting market outreach.[159] They contend that the allegedly false statements were material "because they gave stockholders the misleading impression that Evercore mitigated [J.P. Morgan]'s conflicts, ostensibly legitimizing a tainted market check conducted solely by conflicted Dunleavy's representative."[160]

---

[158] *Pfeffer v. Redstone*, 965 A.2d 676, 689 (Del. 2009) (Even if a proxy statement discloses certain material information, it can still be insufficient if the way in which it presents this information creates a false impression: "[i]t is well settled that '[W]hen fiduciaries undertake to describe events, they must do so in a balanced and accurate fashion, which does not create a materially misleading impression.'") (quoting *Clements v. Rogers*, 790 A.2d 1222, 1240 (Del. Ch. 2001)); *Zirn v. VLI Corp.* 681 A.2d 1050, 1058 (Del. 1996) (observing that the goal of disclosure is "to provide a balanced and truthful account of those matters which are discussed in a corporation's disclosure materials."); *see also Assad*, 2023 WL 7121419, at *6.

[159] Opening Br. at 48.

[160] *Id.* (internal citation omitted).

48

Plaintiffs presented the following chart in their Complaint[161] in an attempt to illustrate the Proxy's overstatement of Evercore's role in the market outreach process:

| **Proxy** | **Special Committee Minutes** |
|---|---|
| On August 11, 2021, the Special Committee . . . ***instructed the representatives of J.P. Morgan and Evercore*** to reach out to a specified list of other potential buyers and strategic partners, in addition to those that had been contacted previously, to assess whether another party would be willing to offer a price that exceeded Nordic Capital X's updated proposal. The Special Committee also ***instructed the representatives of J.P. Morgan and Evercore to re-solicit interest*** of the strategic and private equity bidders who had previously shown interest in exploring a transaction with the Company, including PE Firm B.[162] | August 11, 2021 Special Committee Minutes:<br><br>Following discussion with JP Morgan, Evercore Group L.L.C., independent financial advisor to the Special Committee ("Evercore"), and Latham & Watkins LLP, independent legal advisor to the Special Committee ("Latham"), ***the Special Committee indicated that JP Morgan should actively expand and engage in buyer outreach and negotiations with potential buyers*** other than Nordic Capital as quickly as possible.[163] |
| Between August 11, 2021 and August 13, 2021, . . . ***As instructed by the Special Committee, representatives of Evercore and J.P. Morgan also reached out to 10 potential counterparties***, including PE Firm B and Company D as well as other strategic counterparties and financial sponsors, to gauge their interest in a potential acquisition of the Company at a price at or above $41.00 per share.[164] | August 12, 2021 Special Committee Minutes:<br><br>***JPM Update. Representatives of J.P. Morgan Securities LLC, financial advisor to the Company ("JP Morgan")*** . . . reported on the progress in the past 24 hours of, among other things, (i) negotiations with Nordic Capital and sources of equity financing in connection with funding the transaction and (ii) the buyer outreach and negotiations conducted with potential buyers other than Nordic |

[161] A109–A112 (Compl. ¶ 178).

[162] A266–A267 (Cumings Aff., Ex. 1) (Proxy at 29–30) (emphasis added).

[163] A698 (Cumings Aff., Ex. 26) (Minutes of a Meeting of the Special Committee dated August 11, 2021) (emphasis added).

[164] A267 (Cumings Aff., Ex. 1) (Proxy at 30) (emphasis added).

| | |
|---|---|
| | Capital.<br>* * *<br>***Following discussion with JP Morgan, the Special Committee indicated that JP Morgan should simultaneously continue*** negotiations with Nordic Capital and continue ***the buyer outreach and negotiations with potential buyers other than Nordic Capital*** to determine whether a transaction with a new consortium of investors to sell the Company on equal or more favorable terms was likely to be feasible in a reasonable period of time.[165] |
| The Special Committee held a meeting on August 13, 2021 . . . ***Representatives of J.P. Morgan <u>and Evercore</u> also provided an update on their outreach to other potential counterparties that may be interested in an acquisition of the Company. Representatives of J.P. Morgan <u>and Evercore</u> reported*** that certain potential counterparties declined to participate further in a sale process, other potential counterparties responded with varying degrees of interest, but no potential counterparty had expressed an interest in offering a price at or above $41.00 per share.[166] | August 13, 2021 Special Committee Minutes:<br><br>***JPM Update; Additional Outreach. [JP Morgan] proceeded to present an update on the expanded buyer outreach and negotiations conducted with potential buyers other than Nordic Capital***, including new buyers who had not previously been contacted.<br>* * *<br>Following discussion with Evercore and JP Morgan, ***the Special Committee indicated that JP Morgan should simultaneously*** . . . (ii) continue to reach out to and negotiate with potential buyers other than Nordic Capital, in particular the three potential buyers who were conducting preliminary analyses.<br>* * *<br>***The Special Committee indicated that the Company should . . . (ii) continue to engage in active buyer outreach through*** |

---

[165] A706 (Cumings Aff., Ex. 28) (Minutes of a Meeting of the Special Committee dated August 12, 2021) (emphasis added).

[166] A267 (Cumings Aff., Ex. 1) (Proxy at 30) (emphasis added).

| | |
|---|---|
| | ***JP Morgan.***[167] |
| After extensive discussions [at the August 16 Special Committee meeting], and noting: (1) ***the extensive bidder outreach activity by J.P. Morgan <u>and</u> <u>Evercore</u> since May 2021*** (including outreach to over 30 potential bidders, 14 of which signed confidentiality agreements and commenced due diligence) . . . the Special Committee determined that it would be reasonable to accept the removal of the "go shop" provision . . .[168] | [At the August 16 Committee meeting] representatives of Evercore presented . . . ***an overview of the buyer outreach, market check, and negotiations conducted by JP Morgan***, including the continued and expanded outreach conducted following Nordic Capital's revised offer reducing the price from the previous $44 per share . . . .[169]<br><br>* * *<br><br>[At the August 17 Committee meeting] Mr. Hiltz remarked that while a go-shop provision would be beneficial to the Company by allowing the Company to meaningfully negotiate with other parties during the go-shop period, ***given the robust buyer outreach, market check, and negotiations conducted by JP Morgan***, including the continued and expanded outreach conducted following Nordic Capital's revised offer reducing the price from the previous $44 per share, and the Bloomberg article in late July, the real-world benefits of such a provision were in his view likely to be limited.[170] |

[167] A710–A711 (Cumings Aff., Ex. 29) (Minutes of a Meeting of the Special Committee dated August 13, 2021) (emphasis added).

[168] A268 (Cumings Aff., Ex. 1) (Proxy at 31) (emphasis added).

[169] A716 (Cumings Aff., Ex. 30) (Minutes of a Meeting of the Special Committee dated August 16, 2021) (emphasis added).

[170] A722 (Cumings Aff., Ex. 31) (Minutes of a Meeting of the Special Committee dated August 17, 2021) (emphasis added).

Appellees respond that Appellants have "cherry-picked" statements to create an inaccurate impression. Based upon our review of the Proxy and the minutes, the chart persuades us that the answer lies somewhere in between the two positions but is closer to Appellants' version.

The Proxy does suggest that Evercore had at least an oversight role in the process even though J.P. Morgan, according to the minutes, was directly involved in the contacts and negotiations with Nordic and other potential bidders. The Proxy states, for example:

> On July 25, 2021, at a meeting of the Special Committee attended by representatives of J.P. Morgan, Evercore and [Latham], J.P. Morgan presented a detailed preliminary summary of the bidder outreach conducted and indications of interest received to date and the criteria used to seek out these potential bidders. After J.P. Morgan left the meeting, the Special Committee discussed the presentation and its overall assessment of bidder outreach extensively with representatives of Evercore and [Latham].[171]

> During this meeting [on August 1, 2021], the members of the Special Committee and [Latham] updated the independent directors of the Board who are not on the Special Committee about the Special Committee's activities, Evercore's views regarding the outreach to potential acquirers of the Company conducted by J.P. Morgan and Nordic Capital X's ongoing due diligence efforts and equity and debt financing activities.[172]

The meeting minutes of the Special Committee and the board of directors suggest that Evercore assisted in a review and analysis of that process:

---

[171] A264 (Cumings Aff., Ex. 1) (Proxy at 27).

[172] A266 (Cumings Aff., Ex. 1) (Proxy at 29).

52

*July 25, 2021 Meeting Minutes/Special Committee:*

Members of the Special Committee discussed the importance of the review and analysis by [Evercore], independent financial advisor to the Special Committee, of the buyer outreach and market check conducted by [J.P.] Morgan to date.[173]

. . . .

*August 6, 2021 Meeting Minutes/Independent Directors:*

[An Evercore Representative] reported that Evercore has been focused on, among other matters, (i) reviewing the [J.P. Morgan] Process in connection with considering [an] exclusivity arrangement with Nordic Capital as well as proposing a "go-shop" provision in the merger agreement and (ii) conducting a valuation analysis of the Company . . . reviewing the 10-year financial model prepared by [J.P.] Morgan . . . .[174]

. . . .

*August 12, 2021 Meeting Minutes/Special Committee:*

Noting that the Company is not required to enter into any transaction, with Nordic Capital or otherwise, to sell the Company, the Special Committee discussed with Latham and Evercore potential alternative transactions available to the Company, including a transaction to sell the Company to a different consortium of investors or not to enter into any transaction . . . . Questions were asked by members of the Special Committee and answered by representatives of Latham and representatives of Evercore.[175]

. . . .

---

[173] A702 (Cumings Aff., Ex. 27) (Minutes of a Meeting of the Special Committee dated July 25, 2021).

[174] A1045 (Sullivan Aff., Ex. F) (Minutes of a Meeting of the Independent Directors dated August 6, 2021).

[175] A705 (Cumings Aff., Ex. 28) (Minutes of a Meeting of the Special Committee dated August 12, 2021).

*August 13, 2021 Meeting Minutes/Special Committee:*

The Special Committee further indicated that Evercore, as independent financial advisor to the Special Committee, should coordinate with [J.P.] Morgan and offer to the extent helpful, to be directly involved in such discussion with Nordic Capital and other potential buyers.[176]

. . . .

*August 16, 2021 Meeting Minutes/Special Committee:*

Among other matters, representatives of Evercore presented (i) a summary of the premia and transaction multiples implied by the Current Merger Consideration, (ii) an overview of the buyer outreach, market check, and negotiations conducted by [J.P.] Morgan, including the continued and expanded outreach conducted following Nordic Capital's revised offer reducing the price from the previous $44 per share . . . .[177]

. . . .

*August 17, 2021 Meeting Minutes/Special Committee:*

[A J.P. Morgan Representative] proceeded to present an update on the expanded buyer outreach and negotiations conducted by [J.P.] Morgan, with the participation of [Evercore], independent financial advisor to the Special Committee[.][178]

The minutes depict Evercore's role as more of an analytical and supervisory one. If the

minutes are accurate, as alleged in the Complaint (and chart), then the Proxy does appear

---

[176] A711 (Cumings Aff., Ex. 29) (Minutes of a Meeting of the Special Committee dated August 13, 2021). Appellants interpret this passage to mean that up until that point, Evercore had not been involved in such discussions with Nordic and other potential buyers.

[177] A716 (Cumings Aff., Ex. 30) (Minutes of a Meeting of the Special Committee dated August 16, 2021).

[178] A722 (Cumings Aff., Ex. 31) (Minutes of a Meeting of the Special Committee dated August 17, 2021).

to overstate the role that Evercore played in the outreach efforts in mid-August 2021.[179]

There is nothing wrong with J.P. Morgan taking the lead. As the Chancellor observed, J.P. Morgan was involved in the negotiations a month before Evercore was retained by the Special Committee.[180] But J.P. Morgan had certain conflicts and the trial court based its dismissal of this claim partly on its view that J.P. Morgan was not conflicted.[181] Here, we have held that the Proxy failed to adequately disclose conflicts relating to both Evercore and J.P. Morgan. The Proxy's suggestions of a more active role for Evercore takes on added significance in a scenario where J.P. Morgan, as the lead advisor, faced conflicts. The Proxy's version of the facts suggests that Evercore was in a better position than it actually was to mitigate any effects of J.P. Morgan's conflicts. The trial court recognized the importance of this mitigation role when it said that "[t]o the extent that the special committee perceived [J.P. Morgan's] conflicts, they hired Evercore to help with the process."[182] According to the Complaint, Evercore's mitigation role was affected not only by its own conflicts but also by its secondary and more limited role in the outreach process. It would not be a stretch to say that it is reasonably conceivable that the alleged

---

[179] The minutes even break-out the market outreach discussion with a separate heading — "JPM Update." *See generally* A698 (Cumings Aff., Ex. 26) (Minutes of a Meeting of the Special Committee dated August 11, 2021); A706 (Cumings Aff., Ex. 28) (Minutes of a Meeting of the Special Committee dated August 12, 2021); A710 (Cumings Aff., Ex. 29) (Minutes of a Meeting of the Special Committee dated August 13, 2021).

[180] As noted by the trial court, "[i]t makes sense that J.P. Morgan would continue to spearhead with Evercore's involvement. It also makes sense that J.P. Morgan would be the one to pick up the phone and initiate contact once they had already started the process." Bench Ruling at 45–46.

[181] *Id.* at 45 (observing that Plaintiffs "rely on the characterization of J.P. Morgan as conflicted[,]" but that the court "already concluded that that's not a very persuasive argument.").

[182] *Id.* at 31.

facts could make a difference to stockholders in analyzing and weighing the advice of the advisors and in evaluating the overall effectiveness of the market outreach.

As we cautioned in *Appel v. Berkman*, "when a board chooses to disclose a course of events or to discuss a specific subject, it has long been understood that it cannot do so in a materially misleading way, by disclosing only part of the story, and leaving the reader with a distorted impression."[183]  Rather, "[d]isclosures must provide a balanced, truthful account of all matters they disclose."[184]  And "[p]artial disclosure, in which some material facts are not disclosed or are presented in an ambiguous, incomplete, or misleading manner, is not sufficient to meet a fiduciary's disclosure obligations."[185]

In view of our reversal of the trial court's dismissal of the claims concerning the advisors' conflicts, we need not "pile on" another basis for reversal.  Suffice it to say that the Proxy's description of Evercore's role in the market outreach efforts do not sit comfortably with the corresponding accounts set forth in the minutes.  Boards, committees, and their advisors should take care in accurately describing the events and the various roles played by board and committee members and their retained advisors.

In sum, because the Proxy was deficient in its failure to disclose certain of the Special Committee's advisors' conflicts of interest, we REVERSE the Court of Chancery's dismissal of the Complaint.

---

[183] 180 A.3d 1055, 1064 (Del. 2018).

[184] *Id*. (internal quotation marks and citation omitted).

[185] *Id*. (internal quotation marks and citation omitted).

## IV.    CONCLUSION

For the reasons set forth herein, we REVERSE the decision of the Court of Chancery and remand for further proceedings consistent with this opinion.